HORACE MANN INSURANCE COMPANY, Plaintiff-Appellant, *v.* BIRDIE BROWN *et al.*, Defendants-Appellees.

(No. 11997;

Fourth District—August 1, 1973.

Jack E. Horsley and Richard F. Record, Jr., of Craig & Craig, of Mattoon, for appellant.

Arthur Kreisman, of St. Louis, and Royce B. Sheppard, of East St. Louis, for appellees.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

The plaintiff sought a declaratory judgment, claiming that an automobile libility insurance policy issued by plaintiff to defendant was not in effect on October 7, 1968, when defendant was involved in an automobile collision. The trial court, sitting without a jury, found that the insurance policy was still in force at the time of the accident.

A chronological summary of the events involving the insurance policy is necessary. Sometime in early March, 1968, plaintiff issued two automobile liability insurance policies to defendant Lewis: No. 218794-FA, covering a 1966 Buick, with a premium of $62.30, and No. 218795-FA,

covering a 1965 Mustang, having a premium of $66.10. The total premium paid by defendant Lewis was $128.40 for six months' coverage, beginning March 18, 1968.

On July 31, 1968, plaintiff had not yet sent any notice for the next premium for the period commencing September 18, but defendant anticipated being away on vacation when such payment would be due so; wishing to continue both policies, defendant prepared two checks totalling $128.40, payable to the plaintiff and mailed them to the plaintiff. Defendant's name and address were on the envelope but no explanation as to what the payment was to be applied was included with the checks which were received by plaintiff on August 2, 1968.

The plaintiff's sole witness, its underwriting manager, testified that pursuant to an unvarying company policy, a notice was sent to the defendant no later than August 18, 1968 (30 days prior to the premium due date) which notice would state:

> "NOTICE of automobile insurance premium. This is the only notice you will receive prior to date premium is due. Receipt is sent upon request only. * * * This premium must be paid before date shown or policy lapses 12:01 a.m. date shown."

The plaintiff's records indicate that the premiums for defendant's policies due on September 18, 1968 were $78.60 for the policy covering the Buick and $84.40 for the other policy, for a total of $163.00. The underwriting manager could not testify from his personal knowledge that such a notice was sent to defendant Lewis. Lewis testified that he did not receive any notice which would alert him to the higher premium until September 26, and in an earlier deposition had stated that he did not remember ever receiving any premium notice. Plaintiff cashed the defendant's two checks totalling $128.40, but on September 26, 1968, mailed their check for that amount to the defendant, along with the following letter:

> "We are with regret forced to enclose our check for $128.40. This is a combination of the amount of two checks which you have sent to us. Our records reflect that we billed you for $84.40 renewal premium on policy 218795 and $78.60 renewal premium on policy 218794. So, as you can see, your checks totallng [sic] $128.40 are not sufficient to pay the policies in full and therefore must be considered partial payments. We cannot accept partial payments.
>
> It is our suggestion that you immediately reissue a check or checks in the full amount to assure continuous coverage under your policies."

The insurance company explained that the long delay was caused by a lack of explanation or premium notice with the checks received from

the defendant. The underwriting manager said that by August 29, 1968 it was deduced that the defendant intended the $128.40 to be applied to his automobile liability insurance policies, but that the money was not returned until September 26 due to "just the normal amount of time required to process it after it had been identified."

On the insurance company's copy of the premium notice a pencil line was drawn through the date of September 18, 1968, and a pencil notation of "10/12" made and likewise the expiration date of March 18, 1969 was changed to "4/12". That was explained by the underwriting manager as being made by a clerk in the underwriting department to indicate that if the defendant Lewis made payment by October 12, the company would consider reestablishing coverage.

> The terms of the policy in regard to "Cancelation" reads:
>
> "After this policy has been in effect for sixty days or, if the policy is a renewal, effective immediately, the company shall not exercise its right to cancel the insurance afforded under Part I unless:
>
> 1. The named insured fails to discharge when due any of his obligations in connection with the payment of premium for this policy or any installment thereof whether payable directly or under any premium finance plan;
>
> \* \* \*
>
> 3. the insured violates any of the terms and conditions of the policy; or \* \* \*."

Defendant Lewis, while driving the 1966 Buick insured under Policy No. 218794-FA, was involved in an accident with an automobile in which the defendants Brown were riding on October 7, 1968. Mr. Lewis was hospitalized. Mrs. Lewis testified that she notified the plaintiff by telephone of the accident the day after it occurred. Plaintiff made a number of objections to the testimony of the alleged telephone conversation, but plaintiff did not deny being notified of the accident promptly. On October 11, 1968, defendant Lewis mailed two money orders totalling $163.00 to the plaintiff who received them on October 12. Plaintiff returned these two money orders to defendant Lewis on November 27, 1968, along with a letter stating that:

> "Enclosed are your two money orders in the amount of $163.00. Your automobile insurance policies lapsed September 18, 1968 for non-payment of premium, and no coverage has been provided under said policies since that date.
>
> We have been advised by your wife that you have been involved in an automobile accident. Please keep us advised of any developments which result as a consequence of this accident. Neither by requesting this, nor by anything else the Company has done, or

may do, is it intended to infer that the policies were in effect at any time after they lapsed on September 18, 1968."

The defendants Brown brought action against defendant Lewis for wrongful death and for personal injuries in a joint suit filed in St. Clair County. Plaintiff is defending Lewis in that suit under a reservation of rights and pending disposition of this appeal. The Sangamon County trial court found that the policy was in force at the time of the accident, based primarily upon a waiver of cancellation, citing *Van Hulle v. State Farm Mutual Automobile Insurance Co.*, 44 Ill.2d 227, 254 N.E.2d 457.

Not only because the trial court strongly relied on it, but also because it is a recent statement by the Illinois Supreme Court on the issues involved in the instant case, *Van Hulle* will be analyzed extensively. In that case, Mr. Lax took out an insurance policy on his automobile on May 21, 1964. Six months later the policy lapsed for nonpayment of premium. Thereafter, an expiration notice was sent to Lax, and finally, because no premium was received, a lapse notice was sent on December 16, 1964, stating that the policy had lapsed but would be reinstated upon payment of the premium. No action was taken until January 13, 1965 when Mrs. Lax made out a check payable to State Farm in the amount of the premium and put it in an envelope addressed to State Farm. This envelope with the enclosed check was found in the wreckage of the automobile in which Mrs. Lax was killed on January 22, 1965. Mr. Lax found it and asked some friends to take it to the insurance agent and inform him of the accident. The friends did so, and the agent said he knew of the accident but could not accept the check. However, he advised them to send it to State Farm in Bloomington and have the company decide the matter. The friends sent the check and the lapse notice without further explanation. The next day the agent called the claim office of State Farm and advised the claim officer of the accident and the tendering of the check. On January 29, 1965 (seven days later), Mr. Lax told the agent that if his claim was not going to be covered he wanted the check returned. On February 11, 1965, the agent wrote a memorandum to State Farm briefly explaining the whole series of events and stated that he, the agent, had told Mr. Lax there was no coverage but felt a letter from the company so stating was desirable. On February 15, 1965, State Farm deposited Mr. Lax's check and then on February 18, 1965, mailed Lax a refund check saying the policy could not be reinstated.

The Illinois Supreme Court cited many cases where waiver of forfeiture of an insurance policy was found where the insurer with knowledge of an intervening loss, accepted a premium tendered for the purpose of covering the loss. The court noted that the waiver generally is

not express or intentional, but rather it is implied from the conduct of the insurer or its agents. In order to imply a waiver of lapse, the insurer must have knowledge of the intervening loss. In *Van Hulle*, it is clear that the insurance company had such knowledge.

The court discussed the fact that Mr. Lax had done business with State Farm for some time and had been late in paying the premium on numerous occasions, saying "These facts do not present a situation where a complete stranger was making a frivolous attempt to get coverage from an insurance company." The court also noted that Mr. Lax gave notice of the accident and then stated that he wanted the money back if he was not covered—a good faith attempt to find out if he was covered. In response to State Farm's argument that there had been no acceptance of the late premium, even though the check was cashed, the court cited a case to the effect that cashing a check is acceptance even though the amount is refunded and said: "* * * [A]t some point in the receiving, holding and disposing of a check, there must be an acceptance of it. The Lax check was received on January 26 and cleared the drawee bank 22 days later. Considering the elapse of 22 days and the eventual cashing of the check, we find these sufficient for acceptance, regardless of the fact that the insurer attempted to refund the premium." Finally, in order to find a waiver, an intent to obtain retroactive coverage must be communicated to the insurer. The court added that it was clear the State Farm agent had notice on January 29, 1965, of the conditional tendering of the check.

As to the application of waiver, the Supreme Court quoted from *Simmon v. Iowa Mutual Casualty Co.*, 3 Ill.2d 318, 322, 121 N.E.2d 509:

> "'Automobile insurance has taken an important position in the modern world. It is no longer a private contract merely between two parties. The greater part of litigation in our trial courts is concerned with claims arising out of property damage, personal injury or death caused by operation of motor vehicles. * * * Government and the general public have an understandable interest in the problem. Many persons injured and disabled from automobile accidents would become public charges were it not for financial assistance received from the insurance companies.'"

The court then recognized that "Forfeiture of an insurance contract for nonpayment of premium is not favored in the law, and courts are prompt to seize upon circumstances which indicate a waiver of forfeiture. [Citation] * * *."

A recent case urged as authority by Horace Mann, *Harman v. House* 9 Ill.App.3d 223, 292 N.E.2d 143, found in favor of Aetna Casualty Company and against the insured. In *Harman*, the policy issued on Novem-

ber 5, 1964, said with respect to the quarterly premium: "If such premium is not paid when due, the policy shall terminate as of that date and such shall be the end of the policy period." This statement of a definite termination is much more unequivocal than the policy's provision in the instant case. About 20 days before the due date of November 5, 1965, Aetna advised the defendant that the policy would be continued by payment on or before the due date and House failed to pay. Horace Mann urges that "[T]his equates with the advice the Plaintiff sent to its insured here approximately 30 days prior to the due date and, like the AETNA insured, * * * the insured here failed to pay before the due date." However, in the instant case, it is not established that Lewis was clearly warned beforehand as was House, and Horace Mann had raised the premium, otherwise the amount Lewis sent on July 31 would have sufficed to continue the policy. Also, Aetna's notice, like the policy itself, seems to be much more definite and clear about termination if payment is not received by the due date than in the instant case. A factor clearly distinguishing the instant situation from that in *Harman* is that by sending the check for $128.40 early, Lewis showed an intent to continue coverage.

On November 29, 1965, House mailed Aetna a check for $68 but it was returned uncashed and Horace Mann contends that is just like the money orders in the instant case which were not only mailed in more than 12 days after the due date, but actually after the occurrence of the accident. However, Horace Mann held Lewis's money orders for a much longer period of time—from October 11, 1968 to November 27—as compared to Aetna's keeping the check a much shorter time. In *Harman*, Aetna said the policy terminated for nonpayment. Harman contended that the cancellation notice was ambiguous and had to be construed against the insurer and also that an insurance policy cannot be cancelled after a loss has occurred as to affect the insured's rights. The appellate court agreed with those theoretical principles, but referring to House's failure to pay the proper premium within the authorized period of time, the appellate court held coverage was terminated when the insured failed to pay the proper premium by November 5, 1965, and reversed, entering judgment for Aetna Casualty.

Horace Mann then "interpolates" the *Harman* holding to the facts of the instant case; however, there are many distinguishing factors between the two cases. Horace Mann equates the alleged premium notice of mid-August sent by Horace Mann to the "coverage memo" sent to House, but Aetna's policy language was more unequivocal, the notice of termination was more definite, and Aetna never led House to believe that he was still covered. House's premium was due on November 5 and he sent the

check 24 days late on November 29. On December 1, Aetna had notified the finance company of the termination of coverage on November 5 with a December 13 date of termination regarding the interest of the lien holder. Aetna returned House's check uncashed on December 14, which is 15 days after receipt, not 1½ months as in the instant case. In *Harman*, the accident occurred December 8; the lien holder sent House a letter on December 10 advising that the insurance coverage would end on December 13. Aetna argued the policy terminated for nonpayment with House replying that the cancellation notice created an ambiguity by having different dates for the owner and the lien holder, and the policy could not be cancelled after a loss so as to affect the rights of the insured. However, there was no ambiguity in the policy or the notice sent to House. Aetna never led House to think that he was covered after the due date. In fact, House did not even know about the notice sent to the lien holder referring to a December 13 cutoff until after the accident, and in any event, both the policy and the notice sent to House were clear and consistent.

We believe that the instant case is clearly distinguishable from *Harman* on the facts and although *Van Hulle* is not squarely on point, its principles are controlling.

In *Van Hulle* the more common circumstances surrounding the problem are demonstrated. There the insured did nothing when the premium fell due, and *thereafter* the events (relevant to the issues of lapse, waiver of lapse and the ultimate issue of continuous or retroactive coverage) transpired, followed by loss and tender of premium. Here there are facts, circumstances and events, both preceding *and* following the due date of the premium and loss which must be weighed. In this case, Lewis clearly showed his intention to continue the policy by tendering payment more than 1½ months before it was due and long before the accident by sending the amount which had been the previous premium on the two policies. There was no indication that Lewis could have been aware of the premium being raised at that time. Another factor is the plaintiff's retention of the $128.40 premium payment for almost two months, eight days past the due date, thus leading Lewis to reasonably believe that the payment was accepted and the policy continued. However, subsequent to the due date, on September 26, the amount of $128.40 was sent to Lewis in the form of a Horace Mann check, rather than returning defendant's checks, along with a statement explaining that it was being considered as a partial payment which could not be accepted and with a suggestion that defendant send a larger check to assure *continuous* coverage of the policy. In contrast to *Harman*, there was no direct statement that the policy *had* lapsed and that it might be reissued or rein-

stated, but rather an implication that the policy would remain in force *continuously* if a new check was sent.

These events occurring prior to the accident strengthen defendant Lewis's case. After the accident occurred on October 7, at which time Lewis had cashed plaintiff's check for $128.40 but had not yet sent a check for the new $163.00 premium, Lewis's wife stated that she notified plaintiff at their office in Springfield the day after the accident. There are objections to the wife's testimony as to the conversation with an unidentified person, but it seems to have been satisfactorily established that plaintiff was notified of the accident shortly after it occurred. Thereafter, the more common series of events occurred with defendant sending money orders on October 11 for the higher premium of $163.00. Horace Mann returned the money orders, this time not its own check, 1½ months later on November 27, 1968, stating that no coverage had been provided since September 18 due to the lapse on nonpayment. That letter acknowledged that Mrs. Lewis had notified Horace Mann of the accident and asked for further information concerning the accident but denying liability.

As to plaintiff's objection to Lewis's delay from September 26 to October 11 to send in the higher premium, it should be noted that that time is quite prompt as compared to the plaintiff's delay of almost 2 months in returning defendant's original payment, and the 1½ months' delay before returning the money orders for the second attempted payment.

■■ Here, in simplest terms, we have either a party who intended to let his insurance policy lapse, and then attempted to continue it after incurring a loss; or on the other hand, an insurance company which was willing to accept a late payment for a new higher premium but then after the loss occurred, had second thoughts. The trial judge heard the testimony of the insurance company's witness and of Lewis, and apparently believed Lewis. Lewis clearly indicated, 1½ months before the premium was due, his intention to continue the insurance policy and in good faith tendered the premium in the amount paid for the preceding period. That factor weighs strongly against the contention that he intended to let his policy lapse and then sought to renew it after having an accident. By keeping this payment until September 26—almost 2 months—and past the date the new premium was due without any effort to apprise Lewis that the premium had been changed or that his tendered payment was insufficient, the insurance company led Lewis to reasonably assume that his premium was paid. Then plaintiff's letter of September 26 refers to the $128.40 as a "partial payment" and suggests that a larger amount ($163.00) be sent immediately to assure *continuous*

*coverage*. The record here does not establish an unscrupulous purchaser deliberately permitting a policy lapse, and then endeavoring to secure retroactive continuous coverage following an accident. The plaintiff insurance company appeared very willing to continue the policy and accept late premium until the accident. Of course, it is very noteworthy that the new premium payment of $163.00 was sent by defendant Lewis on October 11, four days after the accident, and if plaintiff Horace Mann had immediately returned those money orders stating that the policy had terminated because of nonpayment, the case would be more difficult —balancing a prompt definite denial of liability against an earlier representation that sending the larger check would assure continuous coverage. However, the insurance company retained the money orders until November 27—about 1½ months—before returning same, stating that there had been no coverage since September 18, 1968.

■■ Therefore, the trial court's decision based upon *Van Hulle*, declaring that there was a waiver of the forfeiture for nonpayment of the entire premium on the due date is supported by the manifest weight of the evidence: that being the insurance company's knowledge of Lewis's intent to continue coverage by the sending of the early, albeit insufficient, premium; the insurance company's keeping of that check for almost 2 months; its representation after the due date of the premium that *continuous* coverage would be assured by prompt payment of the larger premium; and, finally, the insurance company's holding of that later $163.00 payment for 1½ months before returning it and denying that there was coverage.

Affirmed.

SMITH, P. J., and TRAPP, J., concur.